IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

EARRICK BRIGHT,                          *
                                         *
            Plaintiff,                   *
vs.                                      *       No. 3:11-cv-00180-SWW
                                         *
                                         *
EVONIK CYRO, LLC,                        *
                                         *
            Defendant.                   *

OPINION AND ORDER

Earrick Bright brings this action against his former employer, Evonik Cyro,

LLC (Evonik), alleging violations of the Americans with Disabilities Act of 1990

(ADA), 42 U.S.C. § 12101 *et seq.*, and the Family and Medical Leave Act of 1993

(FMLA), 29 U.S.C. § 2601 *et seq.*  Before the Court is Evonik's motion for

summary judgment [doc.#43].  Bright has responded in opposition to Evonik's

motion and Evonik has filed a reply to Bright's response.  For the reasons that

follow, the Court grants Evonik's motion for summary judgment.

I.

Evonik is a manufacturer of acrylics and has a plant located in Osceola,

Arkansas.  Bright began working for Evonik at its Osceola plant in June 2000.  In

2009 and 2010, Bright worked as a Warehouse Assistant.  Bright's primary job

responsibilities as a Warehouse Assistant included selecting and staging outgoing

shipments by loading and unloading trucks using a forklift.

Bright was directly supervised by Materials Department Manager Mike Sargent.  Throughout Bright's employment with Evonik, Mike Wyatt was the Human Resources (HR) Manager at the plant.  Dwayne Mays became the HR Representative at Evonik in 2004.  Mays reported to Wyatt, and Wyatt reported to Plant Manager Jim Bunn.

When Bright was hired, he read, understood and acknowledged his understanding of the Osceola Plant Handbook.  Bright was trained on the handbook policies throughout his employment and understood that Evonik's policies prohibited discrimination under the ADA and provided for reasonable accommodations to be made for employees with disabilities.

Bright understood that Evonik had the right to obtain information from an employee's treating physician to properly determine the type and manner of accommodation an employee needed under the ADA policy and he understood that Evonik had an Equal Employment Opportunity Commission (EEOC) policy that prohibited discrimination on the basis of a physical disability.  Bright understood that he was only entitled to 12 weeks of leave under the FMLA within a 12 month period and he demonstrated his understanding of the 12 month backward rolling period used to determine eligibility.

Evonik has a Short Term Disability (STD) policy which allows employees to receive a percentage of their income during any medical leave of absence for their own medical health condition, based on the number of years of the employee's service. Leave pursuant to the STD policy runs concurrently with FMLA leave, to the extent the employee is eligible for FMLA leave. Based on his years of service, Bright was eligible to take up to 26 weeks of STD leave, with full medical benefits and compensation at 100% of his pay.

Evonik has a Cardinal Rules Policy that includes the following Cardinal Rules: (1) All job-related injuries must be reported immediately; and (2) Employees will safeguard all company property and the accuracy of company records. Bright understood that the Cardinal Rules applied to him throughout his employment and that he could be terminated for any violation of said rules. Bright was trained annually on the Cardinal Rules Policy and attended training most recently in April 2010.

Evonik has a Safety Attire Policy which requires that safety shoes must be worn in all plant areas. Bright understood that, as a Warehouse Assistant, he was required to wear safety shoes, which in this case involved steel-toed boots, at all times in the plant. Safety shoes are essential protective equipment to be worn to protect employees' safety due to the heavy items and heavy machinery being

moved around the plant.

Beginning in August 2009, Bright began experiencing pain and numbness in his feet.  Bright experienced at least some pain in his feet all of the time, but it was not as bad when he wore comfortable shoes, such as sandals or house slippers. Bright testified that the pain in his feet would increase when he worked or when he had to stand or drive for long periods of time.

On September 1, 2009, Bright began receiving treatment for his foot condition from his primary care physician, Dr. Sumner Cullom.  Dr. Cullom diagnosed Bright with tarsal tunnel syndrome and peripheral neuropathy and referred him to several specialists to receive treatment for his foot condition, including a podiatrist, a rheumatologist, and a neurologist, Dr. James Wang. According to Bright, none of these specialists gave him any additional or different diagnoses from Dr. Cullom's initial diagnosis.

Bright's treating physicians recommended that he take time off of work due to his foot condition beginning in August 2009 and lasting through February 2010. This first leave of absence was FMLA-qualifying and Bright was approved for up to 12 weeks of FMLA leave, beginning August 31, 2009.  During the entirety of his first leave of absence, Bright received 100% of his pay and full medical benefits pursuant to Evonik's STD benefit policy.

Bright returned to work from his first leave of absence on February 9, 2010. Upon his return, Bright mentioned to Sargent that his feet were bothering him and that he could not stand or drive for long periods of time without experiencing pain and numbness.  Sargent permitted Bright to take short rest breaks, sit down to get off of his feet as needed, and adjusted his job responsibilities so that Bright could perform less of the type of work that bothered his feet.  However, Bright's doctor indicated that Bright should have been able to work without restriction during that period of time.

Bright's wife, Teresa, was scheduled for knee surgery on July 27, 2010. Prior to her surgery, Bright made a request to Mays to take off on July 27, 2010 so that he could drive his wife to surgery.  At the time of his request, Bright did not have FMLA leave available because he had exhausted his 12-week entitlement to FMLA leave as of the end of November 2009 for his own medical condition and was not yet eligible again to take any additional FMLA leave.  Mays informed Bright that he would be permitted to take the day off as a paid vacation day, but that the absence would not qualify as FMLA leave because he had already exhausted 12 weeks of FMLA leave in the preceding 12 months.  Bright took off on July 27, 2010 and admits that, prior to his absence, he understood that he was

taking the day off as a vacation day, not as FMLA leave.[1]  Bright acknowledges

that he could not think of a request for time off that he needed to take due to

medical reasons that was not granted.

On August 2, 2010, Bright had an office visit with Dr. Wang at which Dr.

Wang provided Bright a doctor's note stating that Bright should work "light duty"

for one month.  The next day, Bright provided Dr. Wang's doctor's note to Wyatt

and requested to be assigned to light duty.  Wyatt informed Bright that Dr. Wang's

note was too vague and that he needed to know what he meant by "light duty,"

such as whether Bright had any specific restrictions on his ability to walk, stand,

sit, lift, or wear steel-toed boots in order to determine if an accommodation could

be made.  Bright acknowledges he told Wyatt that he didn't believe he could

perform his job while wearing steel-toed boots and that the only job he could

perform without wearing steel-toed boots was the Guard House.  In this respect,

Bright requested reassignment to the Guard House as a reasonable accommodation.

The Guard House is a small shack that sits out in front of the plant.  Because

it is outside of the plant, protective equipment, such as steel-toed boots are not

---

[1] Bright alleges that Sargent threatened to assign him additional hours after he
requested off on July 27, 2010 but he admits he was not actually required to work any
additional hours after the alleged threat.  Bright also alleges that Sargent threatened to
change his shift so that he would be required to work more than an eight-hour day after he
requested off on July 27, 2010 but he admits Sargent did not actually make any change to
his shift following the alleged threat.

required to be worn in the Guard House.  Bright states in his deposition that he
only made one request to work in the Guard House and that other than allowing
him to work in the Guard House, he is not sure if there was anything Evonik could
have done to help him perform his job as a Warehouse Assistant in light of his
condition.  In his post-deposition affidavit, however, Bright states that he was able
to wear steel-toed boots and work at his regular job as long as he was able to have
short periods of rest where he could remove his boots (although, as previously
noted, Bright acknowledged he told Wyatt that he didn't believe he could perform
his job while wearing steel-toed boots because his feet hurt all the time).  Bright
also acknowledges in his deposition that other than asking the one time to work in
the Guard House, he did not make any requests for an accommodation to anyone in
HR.  In his post-deposition affidavit, however, Bright claims he made several
requests for accommodations from his supervisor and HR.[2]

Bright testified that he is unable to recall the exact date he requested to work
in the Guard house, but it was a date in 2010 when he came to work with sandals
on.  Bright also apparently claimed his hands were hurting but stated he was not

---

[2] A party cannot defeat summary judgment by submitting an affidavit contradicting
his earlier deposition testimony.  *Urich v. Mid-Minnesota Legal Assistance*, Civil No. 07-
1309, 2008 WL 2891020, *5 n.4 (D. Minn. July 22, 2008) (citing *Camfield Tires, Inc. v.
Michelin Tire Corp.*, 719 F.2d 1361, 1365-66 (8th Cir. 1983)).

good with those dates in 2010 when his hands started hurting, acknowledging that he was on prescription medicine at the time that may have affected his memory. Wyatt states he recalls that the date Bright came in with sandals on and complained about steel-toed boots hurting his feet was August 3, 2010.

Only one position is staffed in the Guard House and it is that of the guard. The guard position has been filled by the same person, Donna York, since 2008. Bright believes that two disabled employees who sustained workplace injuries, Al Henderson and Michelle Johnson, were permitted to work in the Guard House when York was on vacation, but he is not aware if York had any vacations planned during the time he wanted to work in the Guard House. According to Wyatt, August 5, 2010 was the only day York took vacation in August or September 2010, and he notes that it was after Bright's termination that Henderson and Johnson were injured on-the-job and were permitted to work in the Guard House when York was on vacation.

Beginning August 3, 2010, Bright was put on short term disability for his foot condition while Bright and Wyatt worked with his physicians to determine Bright's medical limitations. On August 3, 2010, Bright was informed in-person and via letter that this second leave of absence would not qualify as FMLA leave because he had exhausted all of the FMLA leave he was entitled to in the preceding

12 months. Nevertheless, Bright received 100% of his pay and full medical benefits while he was on STD leave during his second leave of absence.

On August 6, 2010, Dr. Wang provided specific restrictions regarding Bright's ability to perform his job duties. Although Bright could not perform all of his job duties and responsibilities for his entire eight hour shift given Dr. Wang's restrictions–such as performing repetitive motions when unloading trucks, sometimes climbing stairs and ladders, and driving a forklift for more than two hours a day–, Bright states he could perform his job as a Warehouse Assistant with reasonable accommodations.

On August 9, 2010, Dr. Wang submitted an additional certification which clarified that the duration of his recommended work restrictions was only August 2, 2010 through September 1, 2010, and that as of September 1, 2010, Bright could return to work full duty without any restrictions. Bright never submitted any certification from a doctor indicating he could not wear steel-toed boots.

On August 10, 2010, Bright provided to Wyatt a certification from Dr. Cullom, which stated that Bright was unable to do any work at all for one month until his next appointment with Dr. Wang. Based on Dr. Cullom's orders, Bright remained on STD leave for one additional month.

On August 27, 2010, Dr. Wang submitted a certification indicating Bright

could return to work full duty without any restriction on September 9, 2010.

Evonik requested a second opinion on Bright's ability to return to work and Bright

agreed to submit to an independent medical examination (IME), which was

scheduled for October 1, 2010.  While Bright awaited the IME appointment, he

remained on STD leave and did not return to work prior to his termination.

Evonik states that its employees are provided with two options for seeking

compensation and/or leave due to a physical impairment: either workers'

compensation, if the physical impairment is work-related, or STD if the physical

impairment is not work-related.  Evonik states that under no circumstances may an

employee receive compensation under both workers' compensation and STD

because it would require an employee to take an inconsistent position with regard

to the cause of the physical impairment.  Bright does not dispute that employees

may not receive compensation under both workers' compensation and STD but he

states in his Statement of Facts that Evonik's Leave Policy "specifically" allows

for the circumstance in which an employee makes a claim for workers'

compensation benefits and is on STD.[3]  In his affidavit, however, Bright only states

that "I am not aware of any policy at Evonik that prevents an employee from filling

---

[3] Bright does not reference or provide analysis of the section of Evonik's policy that he claims allows such.

a [worker's compensation claim] and filing for STD."[4]

Evonik states that once a work-related injury has been reported, then the employee meets with HR and HR provides the employee with a workers' compensation claim form.  HR submits the form to Liberty Mutual, Evonik's carrier.  Evonik states that Bright never followed the procedure to file an injury report regarding his foot condition.

Bright, however, states that when he reported to HR that he thought his condition was work-related, HR did not provide him with a workers' compensation claim form and did not submit the form to Liberty Mutual.  Bright states he was trained by Evonik in "accident reporting," and since he did not suffer an "accident," he did not know how to proceed.   Bright states that Evonik contacted Liberty Mutual because he had reported to HR that he felt his disability might be work-related but no action was taken.  He states that Liberty Mutual forwarded a claim form to him and he filled it out to the best of his ability.

Evonik states that on September 3, 2010, Bright completed a Claim for Compensation form and filed it with the Arkansas Workers' Compensation

---

[4] Evonik's Leave Policy provides: "An employee who is on Workers' Compensation will be paid in accordance with regulations of the State Workers' Compensation Board or Provincial WS&IB that has jurisdiction. There are no additional or supplemental payments by CYRO permitted."

Commission on September 7, 2010 to initiate a claim for workers' compensation benefits. Bright states that he completed the form sent to him by Liberty Mutual when he called to inquire about workers' compensation but that he did not intend to make a claim for duplicative benefits and that he did not understand that by filing a claim for workers' compensation, he was seeking pay or trying to get money.

Bright's workers' compensation claim was based on the same condition for which he was on STD. Evonik states that prior to filing his workers' compensation claim, Bright never had any discussion with anyone in HR or management at Evonik about the fact that he was considering filing a workers' compensation claim or that he intended to do so. Bright, however, states that he contacted HR and reported that he thought his foot condition was related to his job duties and that he did not specifically state to HR that he intended to file a workers' compensation claim because he did not understand workers' compensation. Bright states he openly reported to both Wyatt and Mays that he thought his condition might be work-related but that they took no action to investigate whether or not this might be the case and did they take any action to report this potential claim to their carrier. Bright additionally states his condition was not the result of an overt accident and, therefore, not obviously the result of a work-related incident. He

states that when he contacted Liberty Mutual, Wyatt did not even talk with him to determine his motive.

On September 9, 2010, Mays was notified by Liberty Mutual that Bright had a filed a workers' compensation claim.  Evonik states that Wyatt honestly believed that Bright was attempting to create a fraudulent situation by leading the company to believe that his condition was work-related so that he could receive 100% of his pay through STD, then trying to receive additional compensation through workers' compensation by claiming the same injury was actually an on-the-job injury. Evonik further states that Wyatt honestly believed that Bright had made a false statement either in his workers' compensation claim form or in connection with his STD claims regarding the cause and nature of his disability.  Evonik states that even accepting that Bright may have been unsure whether his condition was work-related or not, once he chose to begin receiving STD, he should have informed Evonik of his intention to file a workers' compensation claim and discontinued his receipt of STD benefits prior to seeking workers' compensation benefits for the same injury, rather than trying to obtain compensation under both programs at the same time.

Wyatt made a recommendation to Bunn that Bright be terminated.  Bunn approved Wyatt's recommendation and Bright's employment with Evonik was

terminated on October 8, 2010.[5] Evonik states that Wyatt's recommendation was based on Bright's violation of Evonik's Cardinal Rules irrespective of whether Bright actually believed his foot condition was work-related or not, and that if Bright believed his foot condition was work-related, he violated the Cardinal Rule requiring immediate reporting of the on-the-job injuries through the established reporting procedure, or if Bright believed his foot condition was not work-related, he violated the Cardinal Rule requiring employees to safeguard company property and accuracy of records by stating in his workers' compensation filings that his alleged "injury" from August 2009 was work-related.

Following his termination, Bright, on April 4, 2011, faxed a letter to the Memphis District Office of the EEOC setting forth allegations of discrimination. Following further filing activity, the EEOC dismissed Bright's discrimination claim and issued its Right to Sue Letter on June 7, 2011.[6]

---

[5] On October 15, 2010, Mays and Wyatt were first made aware of the results of Bright's IME, which stated that Bright could not be returned to work full duty at that time. Bright disagreed with the IME and believed that as of October 1, 2010 he could have returned to work as a Warehouse Assistant, but that he may not be able to work his entire eight hour shift without taking rest breaks.

[6] The Memphis District Office did not have jurisdiction over Bright's complaint because the alleged employment actions occurred in Arkansas, so his letter was forwarded to the Little Rock District Office for processing. On May 3, 2011, an Intake Supervisor from the Little Rock District Office drafted a charge of discrimination for Bright to review and sign. Bright acknowledged in his deposition that he received the draft charge from the EEOC. Bright stated, however, that he doesn't remember whether

Bright filed this action on September 6, 2011 and filed an amended complaint on November 13, 2012.  Bright's ADA cause of action is based on his claim that Evonik failed to provide him a reasonable accommodation for his disability, and Bright's FMLA cause of action is based on his claim that Evonik retaliated against him for exercising his rights under the FMLA and terminated him for taking or requesting FMLA leave.  See Am. Compl. [doc.#36].[7]

## II.

Evonik moves for summary judgment on, *inter alia*, the following grounds: (1) Bright's ADA failure to accommodate claim is untimely; (2) even if timely, Bright was not a "qualified individual" under the ADA; (3) Bright's claim that he was unlawfully terminated for requesting FMLA leave is without merit as it is undisputed that Bright was not eligible for FMLA leave at the time he made the

---

he signed and returned the draft charge and he acknowledges it wasn't signed, although he later states, "I believe all the papers that I got, I signed them."  In his affidavit, Bright states "I signed and timely returned all papers I received from the EEOC."  On May 27, 2011, Bright completed and signed an Intake Questionnaire to the EEOC, which the EEOC received on June 3, 2011.  The EEOC dismissed Bright's complaint four days later.

[7] Bright admitted in his deposition that these were the only claims he is asserting in this action.  Although Bright submitted a post-deposition affidavit in which he claimed he was terminated because of discriminatory animus against his disability as well as his request for a reasonable accommodation, a party, as previously noted, cannot defeat summary judgment by submitting an affidavit contradicting his earlier deposition testimony.  *Urich*, 2008 WL 2891020, *5 n.4 (citing *Camfield Tires*, 719 F.2d at 1365-66).

request; and (4) Bright has not put forth any evidence that his termination, which

occurred over two months after he requested FMLA leave, was causally connected

to his futile request for FMLA leave or that Evonik's legitimate, non-

discriminatory reason for Bright's termination was a pretext for retaliation.  Evonik

argues there are no genuine issues of material fact with respect to these issues and

that it is entitled to summary judgment as a matter of law.

### A.

Summary judgment is appropriate when "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to a judgment as a matter of

law." Fed.R.Civ.P. 56(c).  The moving party "bears the initial responsibility of

informing the district court of the basis for its motion," and must identify "those

portions of [the record] ... which it believes demonstrate the absence of a genuine

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once

the moving party has properly supported its motion for summary judgment, the

nonmoving party must "do more than simply show there is some metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475

U.S. 574, 586 (1986).  The nonmoving party must respond by submitting

evidentiary materials that set out "'specific facts showing ... a genuine issue for

trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).   The inferences to

be drawn from the underlying facts must be viewed in the light most favorable to

the party opposing the motion.  *Matsushita,* 475 U.S. at 587 (citations omitted).

Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge.  *Reeves*

*v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation and

quotation marks omitted).   However, "[w]here the record taken as a whole could

not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

issue for trial.'"  *Matsushita,* 475 U.S. at 587 (citation omitted).   "Only disputes

over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).   "Factual disputes that are irrelevant or unnecessary

will not be counted."  *Id.*

B.

1.

The Court first addresses the timeliness of Bright's ADA failure to

accommodate claim.  The ADA requires a plaintiff to file an EEOC administrative

charge within 180 days of the alleged unlawful employment practice.  *Bradley v.*

*Little Rock Wasterwater Utility*, No. 4:10-cv-2019, 2012 WL 174382, *1 (E.D.

Ark. Jan. 20, 2012) (citing 42 U.S.C. §§ 2000e-5(e) & 1217(a)).  A timely EEOC

charge is mandatory.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109

(2002).

Accepting the date the EEOC received Bright's faxed letter setting forth

allegations of discrimination–April 4, 2011–as the filing date of Bright's complaint

to the EEOC, only those alleged unlawful employment practices that occurred on

or after October 6, 2010 (180 days prior to April 4, 2011) are timely.  Bright,

however, was only employed three days during the limitations period, October 6-8,

2010, and his ADA failure to accommodate claim is based solely on the alleged

denial of his one request for a reasonable accommodation–to be reassigned to the

Guard House from his permanent position as a Warehouse Assistant.  Although

Bright stated he could not recall exact dates, he states that he requested to be

reassigned to the Guard House on August 3, 2010, and that it was "possible" his

request for an accommodation was made in August 2010 – well outside of the

limitations period.  It is certainly clear that Bright's request for an accommodation

was not made during the week he was terminated.[8]  Thus, Bright's ADA claim is

---

[8] In his brief in support of his response to Evonik's motion for summary judgment,
Bright does not dispute this.  Rather, his argument is that his termination on October 8,
2010 was discriminatory in violation of the ADA and that the date of his termination was
within the 180-day period.  The Court has previously determined, however, that Bright's
only ADA claim is for failure to accommodate, which allegedly occurred some two
months prior to his termination.

untimely.

2.

Even if timely, Bright's ADA failure to accommodate claim fails on the

merits.  In order to obtain relief under the ADA, a plaintiff must show, *inter alia*,

that he is a "qualified individual" under the ADA.  *Brown v. City of Jacksonville*,

711 F.3d 883, 888 (8th Cir. 2013) (quotation marks and citation omitted).  "A

'qualified individual' is one, 'who, with or without reasonable accommodation, can

perform the essential functions' of [his] position."  *Olsen v. Capital Region*

*Medical Center*, 713 F.3d 1149, — (8th Cir. 2013) (quoting 42 U.S.C. § 12111(8)).[9]

"A 'reasonable accommodation' is defined as '[m]odifications or adjustments to

the work environment. . . that enable an individual with a disability who is

qualified to perform the essential functions of that position.'" *Id*. (quoting 29

C.F.R. § 1630.2(o)(ii)).[10]

i.

_____

[9] Congress's 2008 amendments to the ADA, which took effect January 1, 2009, did not fundamentally change the qualification requirement although they excised the term "with a disability" from the subsection defining a "qualified individual." *Brown*, 711 F.3d at 888 & n.6 (citation omitted).  To qualify under the post-amendment ADA, an individual must still be able to perform the essential functions of the employment position with or without reasonable accommodation.  *Id*.

[10] The Court will assume for purposes of today's decision only that Bright was disabled as defined by the ADA.

As an initial matter, the Court finds that placing Bright on STD leave was a reasonable accommodation in these circumstances.  It is undisputed that there were no vacant Guard House positions at the time Bright made his one request to be reassigned to the Guard House as a reasonable accommodation and that Bright was provided paid medical leave instead.  Bright has not demonstrated how Evonik's decision to provide him with STD leave encompassing 100% of his pay and full medical benefits when the one accommodation he requested was not possible violated the ADA.  *Cf. Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 n.3 (8th Cir. 1999) (a medical leave of absence can be a reasonable accommodation under the appropriate circumstances); *Husinga v. Federal-Mogul Ignition Co.*, 519 F.Supp.2d 929, 961 (S.D. Iowa 2007) (reasonable accommodation may include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment).

ii.

Even if placing Bright on paid medical leave was not a reasonable accommodation, Bright has not demonstrated that he was a "qualified individual" under the ADA.  Bright stated in his deposition that he told HR he didn't believe he could perform his job as a Warehouse Assistant wearing steel-toed boots, that he understood that steel-toed boots were required to be worn in his position as a

Warehouse Assistant, that the only job at the Osceola plant that did not require steel-toed boots was the Guard House position, and that other than allowing him to work in the Guard House, he is not sure if there was anything Evonik could have done to help him perform his job as a Warehouse Assistant in light of his condition.  Because Bright concedes that he could not perform the essential functions of his job as a Warehouse Assistant *without* a reasonable accommodation, the issue here is whether Bright could perform the essential functions *with* a reasonable accommodation.  *Kallail v. Alliant Energy Corporate Services, Inc.*, 691 F.3d 925, 932 (8th Cir. 2012) (citing *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 950 (8th Cir. 1999)).

As previously noted, Bright's only proposed reasonable accommodation was to be reassigned to a Guard House position from his position as a Warehouse Assistant.  While reassignment to a vacant position may be a reasonable accommodation, the ADA does not require that a new position be created or an existing employee displaced, *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir. 1995), and it is undisputed that there were no vacant Guard House positions available.  See *Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011, 1019 (8th Cir. 2000) (the existing position to which the employee seeks reassignment as a reasonable accommodation "must be vacant").  Because

Bright was unable to perform the essential functions of his position, with or without reasonable accommodation, he has failed to make a *prima facie* showing of discrimination under the ADA. *Kallail*, 691 F.3d at 933. See also *Peyton v. Fred's Stores of Arkansas, Inc*., 561 F.3d 900, 903 (8th Cir. 2009) ("[I]t is axiomatic that a person who cannot perform any of the functions of a job, with or without reasonable accommodation, cannot, as a matter of law, be considered 'otherwise qualified' under the ADA.").

Moreover, on August 10, 2010, around the time he requested reassignment to the Guard House, Bright gave Evonik a certification from a doctor which stated that he was unable to perform any work at all for one month until his next appointment with another doctor.[11]  Attendance at work is a necessary job function and an employee who cannot meet the attendance requirements cannot be considered a qualified individual protected by the ADA. *Tjernagel v. Gates Corp.*, 533 F.3d 666, 673 (8th Cir. 2008).[12]

---

[11] Based on this certification, Bright remained on STD leave for one additional month.

[12] Bright claims in his amended complaint and deposition that he suffered "disparate treatment" in that two other disabled employees were allowed to work in the Guard House without wearing steel-toed boots while he was not.  This claim fails, however, as Bright has not shown that similarly situated employees outside of his protected class, *i.e*., non-disabled employees, were treated more favorably than him. *Lowery v. Hazelwood School Dist.*, 244 F.3d 654, 659 (8th Cir. 2001).

C.

The Court now turns to Bright's FMLA claim.  The FMLA entitles an

employee to 12 work weeks of leave during any 12-month period if he or she has a

serious health condition that makes the employee unable to perform the functions

of the position of such employee.  *Sisk v. Picture People, Inc*., 669 F.3d 896, 899

(8th Cir. 2012) (citation and quotation marks omitted).  The United States Court of

Appeals for the Eighth Circuit has recognized three types of claims arising under

two subsections of the FMLA dealing with prohibited acts, 29 U.S.C. § 2615(a)(1),

(a)(2):

> (1) "entitlement" claims, *see Pulczinski v. Trinity Structural Towers,
> Inc.,* 691 F.3d 996, 1005 (8th Cir. 2012), or "interference" claims,
> arising under § 2615(a)(1);
>
> (2) "retaliation" claims, arising under § 2615(a)(2), *see Pulczinski,*
> 691 F.3d at 1005–06; *Lovland v. Emp'rs Mut. Cas. Co.,* 674 F.3d 806,
> 811 (8th Cir. 2012); and
>
> (3) "discrimination" claims, arising under § 2615(a)(1), *see
> Pulczinski,* 691 F.3d at 1006; *cf. Lovland,* 674 F.3d at 811.

*Brown*, 711 F.3d at 890-891.

As previously noted, Bright's FMLA cause of action is based on his claim

that Evonik retaliated against him for exercising his rights under the FMLA and

that he was terminated for taking or requesting FMLA leave.  Absent direct

evidence, an FMLA retaliation claim is evaluated under the burden-shifting

framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  See *Sisk*, 669 F.3d at 899.  The employee must first establish a *prima facie* case, which creates a presumption of unlawful retaliation.  *Id.*  To establish a *prima facie* case of FMLA retaliation, the employee must show that: 1) he engaged in protected conduct; 2) he suffered a materially adverse employment action; and 3) the materially adverse action was causally linked to the protected conduct.  *Id*.  The burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for its action.  *Id.*  If the employer meets this burden of production, the employee must then identify evidence sufficient to create a genuine issue of material fact whether the employer's proffered explanation is merely a pretext for unlawful retaliation.  *Id.*

Bright claims that Evonik retaliated against him and subsequently terminated him for requesting FMLA leave to take his wife to the doctor on July 27, 2010. Bright does not dispute, however, that he was not eligible for FMLA leave at the time he requested such leave–having previously exhausted his FMLA leave as of the end of November 2009–and that he was allowed to take July 27, 2010 off as a vacation day and not as FMLA leave.

In *Hill v. Walker*, No. 5:12-cv-00016, 2012 WL 4792738 (E.D. Ark. Oct. 9, 2012), Judge Holmes noted that although the Eighth Circuit has not decided

whether an FMLA retaliation claim can be based on a good faith or reasonable request for leave when the employee is not actually eligible for the leave, the courts of appeal that have addressed the issue have held that an employee must be eligible for FMLA leave in order to state a claim for FMLA retaliation.  *Id*. *2 (collecting cases).[13]  Judge Holmes concluded, however, that because nothing in the complaint before him gave any indication that the employee could believe, in good faith, that she might be covered by the FMLA, he need not decide whether an employee who is not eligible for FMLA leave can nonetheless state a claim for FMLA retaliation when the employee was subjected to an adverse employment action following a request for FMLA leave based upon a reasonable or good faith belief of entitlement to that leave.  *Id*.  Judge Holmes thus dismissed the employee's FMLA retaliation claim.  *Id*.

Bright does not address in his response to Evonik's motion for summary judgment Evonik's argument, based on *Hill*, that he cannot base his FMLA retaliation claim on his futile request for FMLA leave.  Accordingly, Bright has waived Evonik's argument.  See *Satcher v. University of Arkansas at Pine Bluff*

---

[13] But *cf. Johnson v. Dollar Gen*., 880 F.Supp.2d 967, 993 (N.D. Iowa 2012) ("I believe that Eighth Circuit law ... supports my view that notice of a need for FMLA leave, made in good faith, is also 'protected conduct,' invoking the protections of the FMLA from retaliation for exercising or attempting to exercise FMLA rights, whether or not the employee is actually eligible for FMLA leave").

*Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) ("failure to oppose a basis for summary judgment constitutes waiver of that argument").

Even if he has not waived Evonik's argument, this Court, like Judge Holmes, need not decide whether an employee who is not eligible for FMLA leave can nonetheless state a claim for FMLA retaliation based upon a reasonable or good faith belief of entitlement to that leave. It is undisputed that Bright was not eligible for FMLA leave when he requested leave on July 27, 2010 and he admits that he understood the medical leave of absence he took from August 2009 through February 2010 exhausted his 12 weeks of leave and that he was only entitled to 12 weeks of FMLA leave during a 12-month backward rolling period. Thus, as in *Hill*, Bright cannot base his FMLA retaliation claim on his futile request for FMLA leave because there is nothing to indicate that he could believe, in good faith, that he might be covered by the FMLA. Accordingly, Evonik is entitled to summary judgment on Bright's FMLA retaliation claim.

Even if Bright could base his FMLA retaliation claim on his futile request for FMLA leave, he has not established a *prima facie* case of FMLA retaliation. First, Bright has not shown a causal connection between his request for FMLA leave on February 27, 2010 and his termination over two months later given the length of time between the two events and the lack of more evidence of causation.

*Cf. Smith v. Fairview Ridges Hosp.,* 625 F.3d 1076, 1088 (8th Cir. 2010) (determining "approximately one month," without more evidence of causation, is too long) *abrogated on other grounds by Torgerson v. City of Rochester,* 643 F.3d 1031, 1043, 1058 app. (8th Cir. 2011).  Bright also has not shown that Evonik's legitimate, non-discriminatory reason for terminating him–the belief that Bright was attempting to commit fraud in order to receive double-payment from workers' compensation and under Evonik's STD policy for the same disability/injury–was a pretext for retaliation.  See *Pye v. Nu Aire, Inc*., 641 F.3d 1011, 1022 (8th Cir. 2011) ("[a] proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination.").[14]

III.

For the foregoing reasons, the Court grants Evonik's motion for summary judgment [doc.#43].  The Court will enter judgment accordingly.

---

[14] The honest belief doctrine typically applies when the employer raises a ground for termination unrelated to the protected conduct at issue.  See *id*.  The Court does not find in these circumstances that the proffered reason for Bright's termination–alleged fraud–is inextricably intertwined with the alleged protected conduct at issue such that there are genuine issues of material fact for trial.  *Cf. Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 417 (8th Cir. 2010) ("Filing a harassment complaint ... does not insulate an employee from the consequences of violating company policy.").

IT IS SO ORDERED this 30th day of May 2013.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE